The DENVER AND RIO GRANDE WESTERN RAILROAD COMPANY, the Atchison, Topeka and Santa Fe Railway Company, St. Louis Southwestern Railway Company, St. Louis Southwestern Railway Company of Texas, and Southern Pacific Company, Plaintiffs,

and

Ringsby Truck Lines, Inc., et al., Intervening Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

and

Railway Express Agency, Incorporated, and the Greyhound Corporation, Intervening Defendants.

Civ. A. No. 9205.

United States District Court
D. Colorado.

April 11, 1966.

Lee, Bryans, Kelly & Stansfield, Robert S. Gast, Jr., Royce D. Sickler, and T. A. White, Denver, Colo., R. K. Knowlton, Chicago, Ill., Harry B. LaTourette and C. W. Fiddes, Tyler, Tex., and

Jeremiah C. Waterman, Washington, D. C., for plaintiffs.

David Axelrod, Axelrod, Goodman & Steiner, Chicago, Ill., Berl L. Bernhard, Eugene T. Liipfert (of Verner, Liipfert & Bernhard) and Ronald B. Natalie, Washington, D. C., and Edward T. Lyons, Jr., Jones, Meiklejohn, Kehl & Lyons, Denver, Colo., for intervening plaintiffs Ringsby Truck Lines, Inc., Navajo Freight Lines, Inc., Denver Chicago Trucking Company, Inc., Illinois-California Express, Inc., Pacific Intermountain Express Co., Transcon Lines, Watson-Wilson Transportation System, Inc., Western Gillette, Inc., and Consolidated Copperstate Lines.

Richard J. Sigmon, Peter T. Beardsley, Harry J. Jordan, R. Edwin Brady, Roland Rice, and Rice, Carpenter & Carraway, Washington, D. C., for intervening plaintiffs American Trucking Ass'ns, Inc., and Regular Common Carrier Conference.

William H. Dempsey, Jr., Martin J. Flynn, Harry C. Ames, and Giles Morrow, Washington, D. C., and Edward T. Lyons, Jr., Denver, Colo., Shea & Gardner, Washington, D. C., of counsel, for intervening plaintiff Freight Forwarders Institute.

Warren A. Goff, Dallas, Tex., and John R. Barry, Denver, Colo., for intervening plaintiffs Transcontinental Bus System, Inc., American Buslines, Inc., Arkansas Motor Coaches Ltd., Inc., Bayshore Bus Lines, Inc., Continental Bus System, Inc., Continental Crescent Lines, Inc., Continental Panhandle Lines, Inc., Continental Southern Lines, Inc., Continental Tennessee Lines, Inc., Denver-Colorado Springs-Pueblo Motorway, Denver-Salt Lake-Pacific Stages, Inc., Continental Pacific Lines, Inc., Midwest Buslines, Inc., Smoky Mountain Stages, Inc., Tennessee Trailways, Inc., Union Bus Lines, Inc., and Muscatine, Davenport & Clinton Bus Co.

Robert L. Wright, Acting Asst. Atty. Gen., and John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., and Lawrence M. Henry, U. S. Atty., Denver, Colo., filed an answer for defendant United States neither supporting nor opposing the action of the Interstate Commerce Commission.

Robert W. Ginnane, Gen. Counsel, and Robert S. Burk, Atty., I. C. C., Washington, D. C., for defendant Interstate Commerce Commission.

Hodges, Silverstein & Harrington, Denver, Colo., Cravath, Swaine & Moore, and William J. Taylor, New York City, for intervening defendant Railway Express Agency, Inc.

Winston S. Howard and Dawson, Nagel, Sherman & Howard, Denver, Colo., William W. Schwarzer, Stephen R. Grant, and McCutchen, Doyle, Brown, Trautman & Enersen, San Francisco, Cal., for intervening defendant Greyhound Corp.

Before BREITENSTEIN, Circuit Judge, and ARRAJ and CHILSON, District Judges.

BREITENSTEIN, Circuit Judge.

This suit concerns the validity of an order of the Interstate Commerce Commission authorizing the issuance of stock by Railway Express Agency, Incorporated (REA), for sale to The Greyhound Corporation.[1] Various carriers and associations protested the Commission action. The plaintiffs are five railroads, all of which are stockholders of REA. Twenty-nine motor carriers, or associations of motor carriers, have intervened as plaintiffs. REA and Greyhound have intervened on the side of the defendants. We have jurisdiction under 28 U.S.C. § 1336. A three-judge district court is required by 28 U.S.C. § 2325.

REA, Greyhound, and the plaintiff railroads are all subject to the Interstate Commerce Act (the Act). REA is a com-

1. The orders were entered in Finance Docket No. 23324, Railway Express Agency, Incorporated, Stock, and in Finance Docket No. 23374, Southern Pacific Co. v. Greyhound Corp. and Railway Express Agency, Inc.

mon carrier by express on railroads and a common carrier by motor vehicle. It competes with Greyhound in the transportation of property between points in all states of the United States, except Alaska and Hawaii.

REA filed an application under §§ 20a and 214 of the Act[2] for authority to issue 500,000 shares of its common stock to Greyhound at $20 per share upon certain terms and conditions. Various protests, none of which challenged the facts stated by the applicant, alleged that Greyhound was trying to get control of REA in violation of § 5 of the Act,[3] that the issuance of the stock would not conform to the standards of § 20a, and that an evidentiary hearing should be held. The United States Department of Justice intervened asserting that the Commission should act under § 11 of the Clayton Act[4] to determine if the proposed transaction violated § 7 of that Act.[5] Southern Pacific Company, one of the protestants and a plaintiff herein, filed with the Commission a complaint against Greyhound and REA asserting that the transaction encompassed control or management of REA by Greyhound and requesting action by the Commission under § 5 (7) of the Act to forbid the consummation of the proposal.

The Commission held no evidentiary hearing. Its March 15, 1965, order recited the background of the transaction, the corporate situation of REA, and the procedures which had been followed. It said that the filing of a § 5 application is "permissive and may not be required;" that an investigation of possible violations of § 5 of the Act and § 7 of the Clayton Act "would not be appropriate at this time;" and that a hearing was not necessary "for a determination of the application for authority to issue said stock under the provisions of sections 20a and 214." The Commission specifically found that the REA stock issue was lawful, compatible with the public interest, reasonably necessary, and consistent with its intended purpose. The complaint of the Southern Pacific under § 5(7) was dismissed and the stock issue was authorized. This action was then brought to set aside and vacate the order. The Commission has stayed the order until the completion of judicial review.

From 1929 to 1961 REA was operated on a nonprofit basis and either leased facilities or used facilities owned by other carriers. In 1961 it changed to a profit-and-loss basis and embarked on a program of capital expenditures to acquire and modernize terminals and equipment. The financing of such program was difficult because of a short history of profitable operations and an unfavorable ratio of debt to equity. Before 1963 only railroads could be stockholders of REA. Although this requirement was then removed, the charter provision that all sales of outstanding shares are subject to a right of first refusal by the railroad shareholders was retained.

In February, 1964, Greyhound submitted a proposal to REA which in essence covered acquisition of control of REA by Greyhound subject to Commission approval. The offer was not accepted. Thereafter meetings of executives of the two companies produced a "Memorandum of Understanding" which outlined "potential savings or advantageous arrangements" which would result from the merger of the companies or the consolidation of certain activities. These included joint use of terminals, garages, communication facilities, and sales solicitation.

In July, 1964, Greyhound made a second offer which, with some modifications, was approved by the REA Board of Directors and stockholders.[6] The

---

2.  49 U.S.C. §§ 20a and 314.

3.  49 U.S.C. § 5.

4.  15 U.S.C. § 21.

5.  15 U.S.C. § 18.

6.  The stockholders approved by a vote of 1,654,572 shares for and 269,800 shares against. The plaintiffs herein own 211,-762 shares.

terms of the agreement appear in the resolution adopted by the REA Board. The important provisions are:

(1) Greyhound will acquire a 20% stock interest in REA through purchase, at $20 a share, of 500,000 shares of authorized but unissued stock not subject to the right of first refusal;

(2) Greyhound will have a 20% representation on the REA Board;[7]

(3 If the transaction is approved by the Commission. and consummated, Greyhound, for a period of 60 days, will stand ready to purchase, at $20 a share, up to 1,000,000 shares of the outstanding REA stock, subject to the right of first refusal;

(4) The REA Board will seriously consider the sale of REA stock to the airlines and the public; and

(5) "The REA Board shall adopt a resolution declaring the intention to consider seriously and work toward a long-term agreement between REA and The Greyhound Corporation to consolidate operating functions and facilities, and to cooperate in all lawful, feasible and jointly advantageous ways to effect economies, improve service and increase public receptivity and patronage."

The main thrust of the plaintiffs' arguments is that the Commission should not have approved the stock issuance without a hearing. Consideration of this issue requires an analysis of the statutes upon which reliance is placed.

■ The REA application was filed under §§ 20a and 214.[8] Section 20a(2) declares that a carrier shall not issue stock without Commission authorization. Section 20a(6) says: "The commission may hold hearings, if it sees fit, to enable it to determine its decision upon the application for authority." Accordingly, on a § 20a(2) application the Commission

has the discretion to determine whether a hearing shall be held.

■ Section 5(2) (a) (i) covers, among other things, acquisitions of control of one carrier by another through stock ownership and makes such acquisition lawful if approved by the Commission. Section 5(2) (b) requires a carrier seeking authority for such a transaction to present an application to the Commission. Section 5(4) makes it unlawful for a person to enter into a transaction within the scope of § 5(2) (a) without compliance therewith. Section 5(7) authorizes but does not require the Commission on complaint or on its own initiative, but after notice and hearing, to investigate and determine whether any person is violating § 5(4). Here again the holding of a hearing is discretionary with the Commission.

Section 7 of the Clayton Act[9] prohibits a corporation engaged in commerce from directly or indirectly acquiring in whole or part the stock of another corporation engaged in commerce "where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." Section 11 of the same act[10] imposes on the. Commission the duty of enforcing compliance with § 7 where, as here, the parties· concerned are common carriers subject to the Interstate Commerce Act. Section 5(11) of the latter act says that the authority conferred thereunder shall be exclusive and plenary and that any carriers participating in transactions authorized or approved under the section "are relieved from the operation of the antitrust laws."

The argument is that approval of the stock issuance may not be given without determination, after hearing, of the question of control arising under § 5

---

7. This is to be accomplished by amending the by-laws to increase the board membership from 23 to 25. The numbers of directors nominated by the various railroad districts remain constant but the at-large directors will be increased from 5 to 7.

8. Section 214 makes § 20a applicable to motor carriers.

9. 15 U.S.C. § 18.

10. 15 U.S.C. § 21.

of the Act and of the question of the competitive consequences arising under § 7 of the Clayton Act. Although these are somewhat related we shall consider them separately.

The § 5 question is raised in two ways, by the protests filed to the § 20a application and by the complaint of Southern Pacific under § 5(7). These pleadings do not controvert any facts put of record by REA and do not allege any additional factual matters. The pleaded conclusions add nothing. The briefs suggest that cross-examination of the REA and Greyhound officials who participated in the inter-company negotiations may reveal that the true plan contemplates control of REA by Greyhound but no solid basis is shown for the suggestion.

■ Control is "an issue of fact to be determined by the special circumstances of each case." [11] The difficulty here is that important and decisive facts are presently unknown. The transaction contemplates the issuance to Greyhound of 500,000 shares out of a total authorization of 2,576,000 shares. The offer of Greyhound to purchase an additional 1,-000,000 shares from the present shareholders is subject to such shareholders' right of first refusal. This means that when Greyhound proposes the purchase of any such stock, or a block thereof, all shareholders, including the plaintiffs, may acquire that stock themselves. In its order the Commission noted that Greyhound had been told by railroad representatives, including representatives of the plaintiff railroads, "that it would not acquire one additional share under the offer to purchase up to one million shares subject to the right of first refusal by such railroad shareholders." If Greyhound acquired the 1,000,-000 shares it would own over 50% of the REA stock. If the dissident railroads acquired the same amount the shoe would be on the other foot as they would then own nearly 50%.

REA has no executive committee and is governed by a 23-man board of directors. Of these 7, 6, and 5 are respectively nominated by the eastern, western, and southern railroad districts and 5 are chosen at large. The transaction contemplates an increase in the board to 25 members with 5 of the at-large members nominated by Greyhound. Any further change in the board requires the two-thirds vote necessary to amend the by-laws. Even if Greyhound acquires a total of 1,500,000 shares the possibility of a change in the make-up of the board would require the cooperation of other shareholders.

The plaintiffs emphasize that portion of the agreement requiring the REA Board "to consider seriously and work toward" an arrangement for consolidation and cooperation "in all lawful, feasible and jointly advantageous ways to effect economies, improve service and increase public receptivity and patronage." This commits REA only to serious consideration. The effect will depend on the outcome of the offer to purchase the 1,000,000 shares and the subsequent actions of the REA Board.

■ The briefs of the parties devote much space to the Breswick litigation.[12] There the district court first set aside Commission approval of a stock issue on jurisdictional grounds. The Supreme Court reversed noting that the matter of a hearing was governed by § 20a(6).[13] The case was remanded for consideration of whether the stock issue violated the Interstate Commerce Act.[14] The district court after commenting that under § 20a the Commission was not required

11. Rochester Telephone Corp. v. United States, 307 U.S. 125, 145, 59 S.Ct. 754, 83 L.Ed. 1147.

12. Breswick & Co. v. United States, S.D. N.Y., 138 F.Supp. 123, reversed Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726, decision on remand Breswick & Co. v. United States, S.D.N.Y., 156 F.Supp. 227, reversed Alleghany Corp. v. Breswick & Co., 355 U.S. 415, 78 S.Ct. 421, 2 L.Ed.2d 374, decision on remand Breswick & Co. v. United States, S.D.N.Y., 160 F.Supp. 754.

13. 353 U.S. 151, 175, 77 S.Ct. 763.

14. Ibid.

as a matter of law to hold an evidentiary hearing went on to say that the Commission could not approve the issuance of stock without determining the control question which had been raised.[15] The Supreme Court again reversed saying in a short per curiam that the only question open on the remand was whether the transaction violated the Act.[16] Our reading of the decisions convinces us that the Supreme Court has left open the question of whether, when a control question is raised, it must be decided in advance of a § 20a approval of the issuance of stock. In our view a categorical answer cannot be given. In some instances consideration of the public interest may require such determination and in other instances it may not. Generally, the question of control must be answered on a case by case basis. Here we have a situation where the Commission has found that the answer cannot be reached on the basis of the presently known facts. Development subsequent to the stock issuance must be awaited.

The intervening plaintiffs argue that the Commission breached its statutory duty in refusing to institute a proceeding to determine whether the transaction violated § 7 of the Clayton Act. This point was raised before the Commission by the Department of Justice which has not pursued the matter before us. In the interval between Commission action and court hearing the Supreme Court decided Seaboard Air Line R. Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223. In that case two railroads filed with the Commission an application for authority to merge. The Commission approved subject to certain conditions. The district court reversed, concluding that the Commission's analysis of the competitive effects of the merger was fatally defective because the Commission had not determined whether the merger violated § 7 of the Clayton Act. The Supreme Court reversed the district court, holding on the authority of McLean Trucking Co. v. United States, 321 U.S. 67, 80, 85–87, 64 S.Ct. 370, 88

L.Ed. 544, and Minneapolis & St. Louis Ry. v. United States, 361 U.S. 173, 186, 80 S.Ct. 229, 4 L.Ed.2d 223, that the Commission may approve a merger notwithstanding a potential violation of the antitrust laws if it makes adequate findings, after weighing the effects of the curtailment of competition against the advantages of improved service, that the merger would be consistent with the public interest under § 5(2) (b). We see no reason why the principles announced in Seaboard as applicable to a § 5 merger proceeding do not apply to a § 20a stock issuance proceeding. We believe that the Commission has followed those principles. It has not shut its eyes to the competitive effects. All it has done is to say that in the circumstances presented the public interest requires the issuance of the stock and that determination of the competitive effects will be appropriate for consideration after the chain of events started by the stock issuance is ascertainable rather than conjectural.

Whether the approach is under § 5 of the Interstate Commerce Act or § 7 of the Clayton Act the outcome is the same. The Commission has the responsibility of giving effect to the national transportation policy. In the performance of that responsibility the Commission has decided that the REA-Greyhound transaction meets the standards fixed by § 20a (2) and that determination of the control and competition questions must await developments subsequent to the issuance of the 500,000 shares of REA stock to Greyhound. We are convinced that the Commission took the proper course. In Denver Union Stock Yard Co. v. Producers Livestock Marketing Association, 356 U.S. 282, 287, 78 S.Ct. 738, 2 L.Ed. 2d 771, the Supreme Court repeated the observation first made in United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 100 L.Ed. 1081, that Congress did not intend an agency "to waste time on applications that do not state a valid basis for a hearing." The principle applies here. Until the facts are developed by occurrences after the

---

15. 156 F.Supp. 227, 230.

16. 355 U.S. 416, 78 S.Ct. 421.

stock issuance, hearings on control and competitive effects are no more than an exercise in futility. In the circumstances it is not our prerogative to interfere with what we deem to be a reasonable exercise by the Commission of its discretionary powers.[17] The Commission did not decide, and we do not decide, any questions relating to control or competition. They are for the future.

Finally, the intervening plaintiffs argue that the order must fall because the Commission has not made the requisite findings and has not stated the basis of its decision.[18] We do not agree. The facts are not disputed. The Commission decided that it was not appropriate to resolve control and competition questions at this time and that the § 20a(2) standards for approval of stock issuance had been met. In our opinion the Commission order is clear and understandable and presents an adequate basis for judicial review.

The clerk shall forthwith enter judgment for the defendants dismissing the action.

---

**17.** See United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 90 L.Ed. 821.

**18.** See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207; Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 93–95, 63 S.Ct. 454, 87 L.Ed. 626, 332 U.S. 194, 196–197, 67 S.Ct. 1575, 91 L.Ed. 1995.